## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **WILLIAM SYRJALA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | **NO. 18-40019-TSH** |
| | ) | |
| | ) | |
| **TOWN OF GRAFTON, CHIEF NORMAND A. CREPEAU,** | ) | |
| **NEIL MINARDI, JOHN J. BENOIT, MARK R. BENOIT,** | ) | |
| **JAMES M. O'BRIEN, JOHN J. ROPIAK,** | ) | |
| **THOMAS J. FARRELL, THOMAS J. MICHNIEWICZ,** | ) | |
| **LIAM F. O'ROURKE, DANIEL M. WENC and,** | ) | |
| **JAMES C. CROSBY,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF DECISION AND ORDER
### March 24, 2020

**HILLMAN, D.J.**

### Background

William Syrjala ("Syrjala" or "Plaintiff") has filed suit against the Town of Grafton

("Town"), Chief Normand A. Crepeau   (Chief Crepeau"), Neil Minardi ("Minardi"), John J.

Benoit, Mark R. Benoit, James M. O'Brien ("O'Brien"), John J. Ropiak, Thomas J. Farrell,

Thomas J. Michniewicz, Liam F. O'Rourke, Daniel M. Wenc ("Wenc") and James C. Crosby

("Crosby" and, together with the Town and other individually named officers "Defendants")

asserting various federal and state law claims arising out of their response to numerous

emergency/non-emergency calls he and his father made to the Grafton Police Department culminating with his eviction from his parents' residence.

Specifically, Plaintiff alleges the following claims: against the Town under 42 U.S.C. §1983 ("§ 1983") for maintaining a municipal policy or custom of disregarding clearly established unspecified constitutional rights of disabled adults in domestic disturbance and/or by denying Plaintiff "the benefit of a mandated report" (Count I); against the Town under Title II of the American with Disabilities Act, ("ADA"), 42 U.S.C. § 12132 (Count II); against the Town and Chief Crepeau for supervisory gross negligence in violation of § 1983 (Count III)[1]; against all Defendants under § 1983 for violation of his procedural due process rights to life, liberty and bodily integrity (Count IV); against the Town under the Massachusetts Tort Claims Act, for negligent infliction of emotional distress (Count V)[2]; against the individual Defendants in their personal capacity for violation of his unspecified constitutional rights under § 1983 for violating of the mandatory reporting law (Count VI); against the individual Defendants under § 1983 for violation of his substantive due process rights (Count VII); against all Defendants for violation of the Due Process Clause of the 14th Amendment (Count VIII); against all Defendants for

---

[1] In Count III, Plaintiff asserts a § 1983 claims against the Town/Chief Crepeau in his official capacity. Neither the Town nor Chief Crepeau can be found liable based on respondeat superior. Plaintiff has failed to assert any facts which would support a claim against the Town under *See Monell v. New York City Dep't of Social Services*, 486 U.S. 658, 98 S.Ct. (1978)( municipality cannot be found liable on basis of respondeat superior), or any facts which would support a finding against Chief Crepeau in his supervisory capacity (supervisory liability requires plaintiff to establish that behavior of the supervisor's subordinates results in a constitutional violation and (2) the supervisor's action or inaction was "affirmatively linked" to the conduct of the subordinate so that it could be characterized as "supervisory encouragement, condonation or acquiescence" or "gross negligence amounting to deliberate indifference). Therefore, Plaintiff's claim against the Town/Chief Crepeau for "supervisory liability" is baseless. Summary judgment is granted for the Defendants on this claim. *See* note 2, *infra.*

[2] The Plaintiff has elected to file a "kitchen sink" complaint asserting ten claims, with no apparent regard as to whether there is any supporting facts or legal basis therefore. The Court has had to waste valuable time and resources parsing through Plaintiff's disorganized, undisciplined filings. The Court will not waste any additional time addressing baseless claims. Accordingly, summary judgment shall enter for the Town on Count V for the myriad of reasons stated in the Defendants' memorandum.

Massachusetts Civil Rights Act ("MCRA") , Mass.Gen.L. ch. 12, §§11H, 11I (Count IX); and

against the individual Defendants for conspiracy under 42 U.S.C. § 1985(3)(Count X)[3].

This Memorandum and Order of Decision addresses Defendants' motion for summary

judgment (Docket No. 64), Defendants' motion to strike Plaintiff's affidavit (Docket No. 72),

and Defendants' motion to strike Plaintiff's statement of 340 additional facts (Docket No. 73).

For the reasons set forth below, the Defendants' motions are ***granted***.

## THE MOTIONS TO STRIKE

### The Motion To Srike Plaintiff's Affdavit

Defendants seek to strike the Aff. of Plaintiff William Syrjala In Supp. Of Opp. To Defs'

Mot. For Sum. J. ("Syrjala Aff."), attached as *Ex. 8* to *Pl's Controverted Statement of Defs'*

*Material Facts and Pl's Statement of Material Fact in Dispute* (Docket No. 70-1). Defendants

assert that for the most part, the factual assertions made in the affidavit which Plaintiff submitted

in support of his statement of disputed facts and additional facts contradicts testimony he gave at

his deposition.

A party cannot submit an affidavit in opposition to a summary judgment motion which

contradicts prior sworn testimony in order to create a genuine issue of material fact:

> It is settled that "'[w]hen an interested witness has given clear answers to
> unambiguous questions, he cannot create a conflict and resist summary judgment
> with an affidavit that is clearly contradictory, but does not give a satisfactory
> explanation of why the testimony has changed.'"

*Torres v. El Dupont De Nemours & Co.*, 219 F.3d 13, 20 (1st Cir. 2000)(citation to quoted case

omitted)(alteration in original); *sere also Mandarini v. Accurate Engineered Concrete, Inc.* Civ.

---

[3] There are *no* facts in the record which would support a claim for conspiracy under Section 1985.
Accordingly, summary judgment shall enter for the Defendants on this claim. *See* note 3, *supra.*

No. 17-11123-LTS, 2019 WL 7371942 (D.Mass. Dec. 31, 2019)(law does not permit interested witness to contradict sworn deposition testimony or sworn interrogatory answers by submitting affidavit that is clearly contradictory). The reason for this is obvious: sworn statements contradicting or expounding on prior testimony submitted after the filing of a motion for summary judgment are oftentimes "inappropriate attempts to manufacture issues of fact and should be stricken." *Escribano-Reyes v. Professional Heap Certificate Corp.*, 817 F.3d 380 (1ˢᵗ Cir. 2016). At the same time, " '[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment.' " *Reynolds v. Steward St. Elizabeth's Medical Center of Boston, Inc.*, 364 F.Supp.3d 37, 52 (D.Mass. 2019)(citation to quoted case omitted)(alteration in original).

Syrjala asserts that nothing in his affidavit is "intended" to contradict his deposition testimony, rather he is supplementing his interrogatory answers to "clarity certain disputable facts or alleged inconsistencies in his deposition testimony, and to correct what [he] believe[s] to be misstatements or misunderstandings by Defendants of statements [he] made, or material facts about which [he has] personal knowledge, that relate to [his] cause of action." *Syrjala Aff*. at p. 1, ¶2. First, there are procedures in place to correct alleged misstatements made in answers to interrogatories or deposition questions. More specifically, this Court's rules of procedure provide that a party must supplement or correct its interrogatory disclosure or responses "in a timely manner if the party learns that is some material respect the disclosure or response is incomplete or incorrect …." Fed.R.Civ.P. 26(e)(1)(A). As to depositions, the deponent has thirty days after the transcript becomes available to review it and if there are any changes, to sign a statement

listing the changes and the reasons for making them, *i.e.*, deponent has thirty days to produce an errata sheet. Syrjala did not avail himself of these procedural methods for making the substantial changes to his sworn testimony which he attempts to accomplish by way of his affidavit. Substantially all of the factual assertions contained in his affidavit contradict prior testimony, are based on nothing more than sheer speculation, contain impermissible legal conclusions, or are completely irrelevant to his claims. Under the circumstances, the Court is not going to parse line by line to determine those few statements which are not violative of the so-called "sham affidavit" rule. The bottom line is that Syrjala cannot by way of an affidavit filed contemporaneously with his opposition to a previously filed motion for summary judgment attempt to manufacture genuine issues of material fact. The motion to strike the affidavit is *granted*.[4]

<u>The Motion To Srike Plaintiff's Statement of Additional Facts</u>

As part of his opposition to Defendants' Statement of Material Facts in Support of their Motion for Summary Judgment, Plaintiff has included a statement of *340* additional material facts he alleges are in dispute citing, in part, to the Syrjala Aff. as evidentiary support.   The Defendants request that Plaintiff's additional 340 statements of fact be stricken. First, Syrjala's statement of additional facts must and will be stricken for failure to follow this Court's LR., D.Mass. 7.1 which require court filings be *double spaced*.   Plaintiff utilized single line spacing on 33 of the 44 pages of his filing.   Substantively, if Plaintiff's additional facts do not violate LR, D.Mass. 56.1 (requiring that the parties set forth a *concise* statement of the material facts in

---

[4] That being said, as to both the Syrjala Aff. and the Plaintiff's statement of additional facts, both of which are stricken, I have considered a few factual assertions which are not contradictory, are based on personal knowledge and are relevant to Plaintiff's claims.

dispute) outright, they clearly violate the spirit of the rule. More significantly, however, the Plaintiff has included facts and materials that under the broadest interpretation of "relevancy" are not germane to the case. For these reasons, the motion to strike is *granted*.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden

of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or " improbable inferences". *Id.* (citation to quoted case omitted). " ' The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

## **Facts**[5]

The Town is a municipality with a Board of Selectmen who act as its executive branch. The Town's day to day operations are run by the Town's Administrator, Timothy P. McInerney ("McInerny") but legislative decisions for the Town are made by voters. The Police Chief reports to McInerney. Many departments in the Town have boards made up of community volunteers including the Grafton Disability Commission.

Syrjala, at the time of the underlying events was in his mid to late forties, lived in the home of his parents, Richard Syrjala ("Richard") and Alice Syrjala ("Alice"), in Grafton from October 2009 until February 23, 2015. He moved into his parents' home after being diagnosed with Lyme disease by a physician in New Jersey. He contends that the alternative was to move

---

[5] The Court has attempted to discern those statements of material fact which are genuinely disputed. However, Plaintiff has made it very difficult by ofttimes disputing Defendants' asserted facts with statements and commentary that have *nothing* to do with Defendants' asserted facts. For example, Defendants assert the innocuous fact that Chief Crepeau reports to the Town Administrator. Plaintiff asserts *four* statements of fact that allegedly dispute this contention one of which is of dubious relevance and the other three having *nothing* to do with it. Moreover, at times Plaintiff's factual statements disputing the Defendants' contentions do not cite to any evidence in the record in support thereof in contravention of this Court's LR, D.Mass. 56.1. Additionally, there is no rhyme nor reason to the order in which Plaintiff disputes Defendants' statements of fact, that is, he disputes statement No. 13, then No. 16, then No. 14, then No. 15, then No. 34, then No. 57, then No. 126 and so on. The result being there is no cohesion to Plaintiff's submission, rather it is a rambling and disjointed presentation. Frankly put, Plaintiff's filings are a mess with numerous corrections, re-filings and missing documentation. At times, the Court was unable to find documentary evidence cited by Plaintiff in support of his statements of disputed facts. For example, he contends that the Field Guide includes various statements and cites to Ex. 4PDC.12., which is not included is his submission (that the Court could find). Under these circumstances, the Court has largely adopted the Defendants' statement of facts.

into a nursing home.   No one else lived at the home other than he and his parents.   On May 16, 2008, prior to being diagnosed with Lyme Disease, Syrjala had been forced to stop working because of symptoms caused by his atrial fibrillation and dysautonomia. Syrjala was awarded, Social Security Disability benefits as a result of these medical conditions and his inability to work. Syrjala occupied the upstairs of his parents' home where his bedroom was located, he stored items in the basement under a stairwell and converted a spare office into a secondary upstairs bedroom.   Essentially, Syrjala had access to the entire house and except for events which took place leading to this action, no room was off limits. Syrjala admits to being "disorganized" at home.

Syrjala did not have a caregiver and while Richard and Alice were not his caregivers, Alice would at times drive him to medical appointments. On other occasions, Syrjala would take a cab, or, on rare occasions, drive himself. When Syrjala's brother Michael was at the house, he also helped out by doing things such as picking up his medications, bringing heavy items upstairs for him, or by sitting with him.   For periods of time, such as when Alice and Richard went on vacation, Syrjala would be in the home alone

According to Syrjala, his mother began verbally abusing him about one year before he moved into his parents' home. The abuse started at his brother Brian's wedding when Alice yelled at him for sitting during a family wedding photo. He alleges that his mother continued to verbally abuse him after he moved into his parents' home. This "abuse" started to "ramp up" in 2010. According to Syrjala his mother's verbal abuse centered around her disbelief that he was sick. Family members accused him of faking his disease and asked him "why are you doing this to your parents." Syrjala asked his mother to speak with these family members in his defense and

she responded "Let them abuse you. This is my house, you follow my rules. They can do and say whatever the hell they want to you and you need to shut up and take it." Syrjala went online and spoke with "roughly 50 psychological professionals" who informed him that these comments by his family were "blatant verbal abuse." Syrjala also felt verbally abused by his mother when she asked why he was wasting his money on medical care. Alice made "all sorts of statements like this over the years. Despite suffering from this alleged abuse over a significant period, Syrjala never moved out of his parents' home.

According to Syrjala, his physical medical symptoms had almost completely disappeared midway through 2014 and by January 2015, were almost completely gone. He was able to voluntarily attend family functions and weddings. Functionally, he was fully normal. Additionally, the purported "abuse" from his parents stopped from November 2014 to February 2015. In January 2015, the plaintiff started working 12 hours per day and was "doing well."

Syrjala was doing so "well" and was so entrenched in working during this period that he would sometimes forget to take a shower.   Around the beginning of February 2015, Alice again started to "abuse" Syrjala by telling him he was "worthless" and a "piece of trash."   She stated to him: "who the f*** do you think you are being in my house wearing headphones so that I can't talk to you?"   When Syrjala told her he was willing to speak with her if she could be nice, Alice responded "F*** you. What the hell's wrong with you? Who do you think you are?" Furthermore, Alice would make remarks such as, "Oh, I know you're not dead because I saw that the dishes were done after four days. I hadn't seen you in four days out of your room, but you did the dishes, you're not dead."   Syrjala alleges that he was verbally abused by both of his parents during this period. They started calling him names and swearing at him about his

headphones. He alleges that when his parents started abusing him again his physical symptoms returned.

On February 14, 2015, Syrjala decided he needed to "call for help" from a social worker or someone who could sit with his parents, tell them to stop verbally abusing him and to negotiate an agreement on a date for him to move out, that is, he wanted a professional to assist him with negotiating a date for him to leave his parent's house. He decided to call the Grafton Police instead of another agency because it was a Saturday and he presumed none of those agencies were open on a Saturday. Syrjala acknowledges that he made no serious attempt to contact any other agencies. When Syrjala called the Grafton Police Department on February 14, 2015 to mediate a resolution between he and his parents, he did not want them to come to the home because nobody had committed a crime. He viewed the police as professionals who know how to mediate a domestic dispute.

During this first call, Syrjala advised the dispatcher that he was disabled and was in a living situation of extreme verbal abuse by his parent caretakers. The dispatcher advised the plaintiff that an agency could assist him, and she asked if she could send a police officer to speak with him. When Syrjala declined, the dispatcher offered to have a police officer call him back, which he accepted. Lieutenant (then-Sergeant) Minardi, returned Syrjala's call and believing that he was calling about domestic issues concerning his living situation, provided him with information for the Disabled Persons Protection Commission ("DPPC"), including giving him the website for the DPPC.   Syrjala felt intimidated during the phone call with Minardi because he told Minardi about the alleged abuse and Minardi did not ask him any follow up questions related thereto.

Later that day, the Grafton police received a second phone call from the residence, this one from Richard claiming that Syrjala was having a "major psychotic episode" and was having difficulty breathing.   In that call, Richard told the dispatcher that his son was being verbally abusive to he and his wife, that they were afraid of him and wanted him out of the house. Richard asked for a police officer to come to the home. Before the police arrive, Richard lunged at Syrjala and threatened to drag him out of the home into a blizzard and "lock the door." Richard then lunged toward Syrjala but Syrjala backed himself into the corner of the room. According to Syrjala, Richard's actions caused him to defecate in his pants. Richard then left the room. Syrjala testified that prior to this conduct by Richard, he had a normal day.

When the police arrived, Syrjala had cleaned himself up and was laying down on the floor in the upstairs office hooked up to his oxygen tank. The Grafton police officers who showed up made small talk with him and asked him what he was doing. Syrjala responded that he was disabled and could not breathe or walk which was why he was hooked up to his oxygen. Syrjala also told the officers that Richard had threatened to drag him out into the blizzard. Syrjala describes this event with his father as an attempted murder, that is, his father tried to kill him. Richard, on the other hand, informed the officers that Syrjala was abusive towards him and asked the police to remove him from the home. The police did not remove Syrjala from the home.

After this visit from the Grafton Police, Syrjala "realized that they were not going to help" him in "any way, shape or form."   Nonetheless, in the early morning hours of February 15, 2015, Syrjala called the Grafton Police Department to report that his father had barricaded himself in his room. He called the police "just to keep track" of what his father was doing.

When the Grafton Police arrived, Syrjala was able to walk steadily and greeted them at the door. He did not tell the officers that he was disabled or sick. After telling the officers about his father, the officers woke up Richard and asked him what was going on. Syrjala thought it was "weird" that the officers only asked Richard questions. At some point during the officers' discussion with Richard, Syrjala interjected and accused his father of trying to "kill him" six hours earlier. After some back and forth between Richard and Syrjala, Richard returned to his bedroom and put the barricade back up.

When the officers were alone with Syrjala in the foyer, he again stated that his father tried to kill him. No further comments were made between Syrjala and the officers and they left the home. On February 16, 2015, Richard called the Grafton Police Department to report Syrjala as a trespasser and requested that he be removed from the home. However, Syrjala was not removed from the home or charged with trespass. Later that same day, Syrjala also called the Grafton Police Department to report "someone" trying to break into his room violently. While on the phone with Syrjala, the dispatcher confirmed that the "someone" was his father. According to Syrjala, his father was smashing on his bedroom door so badly that he could see the door, which was locked, reverberate. When the police arrived, Syrjala had opened his bedroom door. Officers Wenc, O'Brien and Richard were standing in the bedroom doorway. According to Syrjala, O'Brien told him that unless there was blood or an ax through his door, he could not keep calling 911. The officers spoke to Richard and looked around the home including looking at Syrjala's bedroom door.

On February 17, 2015, the Grafton Police Department received a call from a nurse practitioner, Lisa Nicotera ("Nicotera"), who works with Syrjala's Lyme disease and

Dysautonomia doctor, Dr. Barry Elson. Syrjala had purportedly called Nicotera earlier that morning to cancel his appointment because he was afraid if he left the house, his father would lock him out. Nicotera reported that Syrjala told her that his father had tried to kill him, that the police had been to the home five times and that the police found no evidence.[6] As a result of Nicotera's call, Crosby (a sergeant with the Grafton Police Department) went to Syrjala's residence. According to Syrjala, he approached Crosby and tried to show him pictures of his locked-up medication on his cell phone. Syrjala testified that Crosby responded, "Get that f***ing thing away from me or I'm going to arrest you.". According to Syrjala, his father had locked the entrance to the garage on February 16, 2015 preventing William from accessing medication that he kept in a refrigerator in the garage. However, by the time Syrjala tried to show Crosby pictures of the lock on his IPhone, Richard had unlocked the garage door and Syrjala had access to his medications.

From February 17, 2015 to February 20, 2015, Syrjala made about 200 phone calls to the FBI, the Department of Justice, the U.S. Attorney's office, domestic violence hotlines, doctors, lawyers, realtors and landlords. Every agency he called told him that he was "on his own" and that there was "nothing they can do about it." Syrjala was also using the internet significantly during this period but did not find any solutions. Syrjala called the DPPC twice on his own behalf in February 2015. Between February 17, 2015 and February 22, 2015 neither Syrjala nor Richard called the Grafton Police Department for assistance. However, Syrjala did call the Grafton Police Department on February 21, 2015 to inquire whether the Grafton Police would let

---

[6] Nicotera told the dispatcher that she suspected mental illness. Nonetheless, Syrjala has not brought an action against Nicotera for failure to file a mandated report with the DPPC

him back into the residence if he left and Richard changed the locks. Syrjala was informed that his question involved a civil matter and not a criminal matter.   Later that day, Syrjala called the department to inquire about obtaining copies of police reports.

On February 21, 2015, Syrjala received a seventy-two (72) hour Notice to Quit ("Notice to Quit") from Richard. Syrjala threw the notice aside and did nothing because he "knew it was nothing." On February 22, 2015, Syrjala called the Grafton Police Department because he wanted help retrieving a blender from his father. Richard put the blender back out for him later that evening. Richard also called the Grafton Police Department on February 22, 2015 to report that Syrjala had threatened him. Officers arrived, spoke with Syrjala and observed barbells and a baseball bat in his bedroom. Syrjala was not arrested. Richard then obtained a Mass.Gen.L. ch. 258E Harassment Prevention Order ("Chapter 258E Order")[7] against Syrjala. In the early evening of February 23, 2015, Sergeant Harrington (ret.)("Sgt. Harrington") and Officer Collette ("Collette") of the Grafton Police Department appeared at the residence to serve Syrjala with the Chapter 258E Order and remove him from the home pursuant to a court order. While the Grafton Police Department usually give people ten to fifteen minutes to leave a property when they serve a Chapter 258E Order, Sergeant Harrington gave Syrjala almost two hours to pack his belongings and leave the property. While he packed, Syrjala was on the phone going up and down the stairs.   He struggled to find his wallet and indicated that he could not look for his medications to pack until he found his wallet. According to Syrjala, he left certain medication

---

[7] Pursuant to Chapter 258E, a person suffering from harassment (as defined in the statute) may file a complaint in court requesting protection from such harassment and may seek to have the defendant, *i.e.*, the harasser, refrain from abusing or harassing the plaintiff, refrain from contacting the plaintiff without court authorization, and stay away from the plaintiff's residence. Mass.Gen.L. ch. 258E, § 3.

behind that evening because he was having troubling finding his wallet. However, he was able to pick up this medication with the assistance of the police at the Grafton Police Department on February 26, 2015. While a Grafton police officer can be paid as a detail police officer to stay on a premise and keep the peace while someone packs their belongings and leaves pursuant to a Chapter 258E Order, the detail must be arranged in advance, that is, Syrjala could not have made such an arrangement while the Chapter 258E Order was being served on February 23, 2015.

According to Chief Crepeau, each Grafton Police Officer receives a Quick Stop Field Guide ("Field Guide") every year which among other things, advise them of changes in the law. They also receive forty (40) hours of annual in-service training, and legal updates from the police academy are forwarded to them. This training includes how to interact with people who suffer from mental health issues. Chief Crepeau does not make sure that the officers read the materials. He acknowledges that officers are expected to report abuse or neglect as a mandated reporter if the officer finds that there is something that's reportable. Officers investigate claims to see if there is any credence to them. The outcome of the investigation depends upon what the officer finds at the scene and the officer must determine whether there is probable cause to see if further action is needed. Each officer has their own way to deal with different situations. People often make claims to the police that prove to be fruitless and officers must sift through these claims to identify those which are valid. Individuals also, at times, present to the police smelling badly and appear unclean.

## Discussion

Defendants contend that the underlying basis for all or substantially all of Syrjala's claims is that individual members of the Grafton Police Department violated the Massachusetts

15

mandatory reporting law which provides that "mandated reporters shall notify the [DPPC] orally of any reportable condition immediately upon becoming aware of such condition and shall report in writing within forty-eight hours after such oral report." Mass. Gen. Laws Ann. ch. 19C, § 10. For purposes of Section 10, a "disabled person" is "a person between the ages of eighteen to fifty-nine, inclusive, who is a person with an intellectual disability … or who is otherwise mentally or physically disabled and as a result of such mental or physical disability is wholly or partially dependent on others to meet his daily living needs," and a "mandated reporter" includes "any police officer … who, in his professional capacity shall have reasonable cause to believe that a disabled person is suffering from a reportable condition," a "reportable condition" includes "a serious physical or emotional injury resulting from abuse…", a "caretaker' is "a disabled person's parent, guardian or other person or agency responsible for a disabled person's health or welfare, whether in the same home as the disabled person… "   Mass.Gen. L. ch. 19C, §1.

Massachusetts courts have interpreted Chapter 19C coextensively with Mass.Gen.L. ch. 119, §51A (governing mandatory reporting of suspected child abuse). *See Cooney v. Dep't of Mental Retardation*, 52 Mass.App.Ct. 378 (2001). In interpreting Section 51A, Massachusetts courts have made clear that the statutory scheme "does not require the reporting of every bruise; it requires reporting based on indicators which give reasonable cause to believe that a child is being abused …. [it means] a 'threshold function, thereby implying a relatively low degree of accuracy' '[A] presentation of facts which create a suspicion of child abuse is sufficient.to trigger the requirements of §51A'" *Id.*, at 383 (citation to quoted case omitted). "Reporters are 'not permitted to weigh the credibility of witnesses, sift the evidence, or determine whether the department would find reasonable cause to conclude that abuse did in fact occur.' Discretion is

limited to ensuring that something more than a mere allegation of abuse exists, to rule out 'assertions that are impossible, utterly fantastic, plainly fabricated, or made only in jest.'" *Doe v. Bradshaw*, 203 F. Supp. 3d 168, 179–80 (D. Mass. 2016)(internal citations and citation to quoted case omitted). Defendants assert first, that Syrjala was not "disabled" within the meaning of the statute. For purposes of this discussion, I will assume that he was disabled under the statute and focus on their second argument, that there was not reasonable evidence of verbal or physical abuse which would have required any individual Defendant (who are admittedly mandatory reporters) to file a report with the DPPC.

Syrjala's asserts that based on his interactions, with the Grafton police that the Defendants had reasonable cause to believe that he was being subjected to *serious* physical or emotional abuse by Richard and/or Alice such that they were required to file a report with the DPPC. I disagree. Chapter 19C, like Chapter 51A, requires reporting based on indicators which give reasonable cause to believe that a person is being abused. In this case, both Syrjala and Richard repeatedly called the police making like claims against the other in what objectively appeared to be a domestic dispute involving parents wanting an adult child to move out of their home. Moreover, despite being called to the residence on numerous occasions as the result of disputes between Syrjala, Alice and Richard, no one from the Grafton Police Department ever witnessed any of the alleged verbal abuse.

I agree with the Defendants that on this record, no reasonable factfinder could find that any of the Defendant police officers would have been placed on reasonable notice that Syrjala was the subject of *any* type of abuse, albeit physical or verbal, such that they were required to

file a report with the DPPC.[8]  Additionally, I find that none of the Defendants *prevented* Syrjala from taking his medications or medical equipment with him when he was evicted from the residence. More specifically, Syrjala takes the position that he was forced to gather his belongings and get out of the house in less than two hours, totally ignoring the that pursuant to the Notice to Quit, he had been given notice almost two days prior that he would have to leave his parents' home by the next day. Rather than gathering his belongings in preparation to leave, he admittedly ignored the notice since he thought it was nothing. Under the circumstances, the approximately two-hours Defendant police officers gave him when they showed up at the residence to supervise his leaving was more than adequate for him to gather all his necessary possessions, including his medications and medical equipment.   These findings will inform the Court's rulings on Plaintiff's remaining claims.

<u>Plaintiff's § 1983 and MCRA Claims</u>[9]

As to the Town, for the reasons set forth below, taking the facts in a light most favorable to Syrjala, I find on this record that Plaintiff has failed to establish that his rights were violated by any of the individual Defendants and therefore, his claims against the Town fail. Moreover,

---

[8] The gravamen of the claim is unclear, however, the complaint can be read to assert that Defendants violated Syrjala's rights by failing to either make a report or take other action regarding the state of the living conditions in his residence, that is, the poor conditions were evidence of abuse. First, Syrjala was an adult living with his elderly parents and had his own rooms—they were not his caretakers and there is not a scintilla of evidence that they were responsible for the state of his living conditions. Additionally, based on the record before me, there is no evidence that Syrjala's living conditions were such that Defendant police officers would have been placed on reasonable notice that they were evidence of abuse.

[9] The MCRA has been interpreted to be coextensive with § 1983, except that to recover under the MCRA, a plaintiff must establish that the constitutional violation occurred by "threats, intimidation, or coercion." *Kelley v. LaForce*, 288 F.3d 1, 10 (1st Cir. 2002). Additionally, the same qualified immunity standard applies to § 1983 and MCRA claims. *Lucien-Calixte v. David*, 405 F. Supp. 3d 171, 179 (D. Mass. 2019). In this case, Plaintiff has failed to assert facts which would establish that the alleged violations occurred by threats, intimidation and coercion and therefore, his MCRA claims fail as a matter of law. Moreover, because the two statutes are interpreted coextensively, to the extent the Court finds that Plaintiff has failed to state a claim under § 1983, he has failed to state a claim under the MCRA.

Plaintiff has failed to establish a custom or policy of the Town which led to the deprivation of his rights. *See Monell*, 486 U.S. 658, 98 S.Ct. (Liability may be imposed on municipality if execution of a policy or custom caused individual to suffer constitutional deprivation and policy or custom was "moving force" behind constitutional deprivation. Thus, municipality is liable for constitutional deprivations when improper action stems from decision officially adopted and promulgated by it). Additionally, the Town cannot be liable for violating the MCRA. *Mercurio v. Town of Sherborn,* 287 F.Supp.3d 109, 123 (D. Mass. 2017)(MCRA applies to "persons" only, and not municipalities, and therefore, Town cannot be held liable for violating the statute). Therefore, the Town is entitled to summary judgment on Plaintiff's state and federal civil rights claims.

### *Plaintiff's Claims against the Individual Defendants for Failure to File a Mandatory Report, Deprivation of his Property Rights, and Violation of his Right to Bodily Integrity*

Plaintiff asserts that the Defendant police officers violated his rights when, as mandatory reporters, they failed to report to DPPC that he was being abused by his parents. First, I have found that the Defendants did not violate Chapter 19C or deprive him of his property (medication and medical equipment), as a matter of law, which ends the discussion as to these claims. Additionally, the Court cannot discern from the Plaintiff's complaint or his filings the bases for his claim that the Defendants violated his right to privacy and bodily integrity and therefore, summary judgement shall enter for the Defendants on this claim[10].

---

[10] Were Syrjala proceeding pro se, the Court would be required to construe his claims liberally, that is, the Court will make the necessary inferences where the allegations suggest an actionable claim. However, Syrjala is represented by counsel and therefore, is expected to state his claims in such a way that the cause of action is readily discernible to both the Court and the Defendants.

_Plaintiff's Claims against the Individual Defendants for Violation of his Substantive Due Process Rights_

Even if the Court were to accept the facts as asserted by the Plaintiff, he cannot establish that the actions of the individual Defendants were outrageous or "shocked the conscience." _See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs._, 489 U.S. 189, 196, 109 S.Ct. 998 (1989) (holding that social services agency and social workers did not violate a child victim's substantive due process rights by failing to protect him from his abusive father, notwithstanding significant evidence establishing that the child was subjected to beatings). Moreover, accepting Plaintiff's version of the facts, the record will not support a finding: (1) that any Defendant affirmatively placed him in danger that he otherwise would not have faced, (2) that such danger was known and obvious; and (3) that any Defendant acted with deliberate difference to such danger. Therefore, the state-created danger exception to the general rule, does not apply. _See Henry A. v. Willden_, 678 F.3d 991, 1002 (9th Cir. 2012). Accordingly, Defendants are entitled to summary judgment on this claim.

_Plaintiff's Claim against the Individual Defendants for Violation of his Procedural Due Process Rights_

To state a claim for violation of his procedural due process rights, Plaintiff must show that Defendants deprived him of a cognizable liberty interest without sufficient process. "Analysis of an alleged violation of procedural-due-process rights requires two steps: "[w]e first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." _Pimentel v. City of Methuen_, 323 F. Supp. 3d 255, 269 (D. Mass. 2018)(quoting _Swarthout v. Cooke_, 562 U.S. 216, 219, 131 S.Ct. 859 (2011)).

To the extent that Syrjala is asserting that the Defendants violated his procedural due process rights by failing to file a mandatory report, as discussed previously, no report was required to be filed and therefore, this claim fails. Additionally, as argued by the Defendants, failure to file a mandated report under Chapter 19C would not constitute a due process violation. *See Jones v. Nickens,* 961 F. Supp. 2d 475, 492 (E.D.N.Y. 2013)(Although New York's child welfare legislation mandates that reports of suspected child abuse be made by certain individuals in particular fashion, it does not create an entitlement or expectation of particular outcome (but merely authorizes particular actions and remedies to address the reported abuse) so as to trigger due process protection); *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 216 (S.D.N.Y. 2013)(no authority to support claim that defendants failure to comply with abuse reporting requirements violated procedural due process rights) and cases cited therein; *see also Lipman v. Budish*, 383 F. Supp. 3d 764, 776–77 (N.D. Ohio 2019)(state-created procedural rights that do not guarantee particular substantive outcome are not protected by Fourteenth Amendment, even where such procedural rights are mandatory).

<u>Plaintiff's ADA Claim</u>

Syrjala claims that the Town violated his rights under the ADA by denying him participation in the Building Partnerships for the Protections of Disabilities Initiative Program ("BPI"). Put another way, as a disabled person, he sought "services" from the Town, but was denied access to those services "solely by reason of his disability." More specifically, he alleges that the Defendant police officers were aware that he was physically and mentally disabled and they denied him the opportunity to be included as a "disabled subject worth of beneficiary status to participate in the program," by, as mandatory reporters, failing to file an abuse report with the

DPPC (which presumably upon receipt of such a report, would have evaluated him for inclusion in the program). He also claims that his rights were violated under the ADA when those officers which responded to his residence in connection with the Chapter 258E Order failed to accommodate his disability by giving him extra time to pack.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The basic elements for either claim that a plaintiff must prove are (1) that he or she is a qualified person with a disability; (2) that he or she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program; and (3) the denial or discrimination was because of his or her disability

For purposes of this discussion, I will assume that Syrjala is a qualified individual with a disability.   The gravamen of Syrjala's ADA claim for failure to file a mandatory report is vague and obscure. In any event, since the Court has found that the Defendants were not obligated to file a report of abuse with the DPPC, any claim directly based on such allegation fails. Syrjala speculates that had the Defendants filed a mandatory report with the DPPC, he would have received entry into programs or services for the disabled. First, during the same time frame that Syrjala alleges Defendants failed to file a mandatory report of abuse with the DPPC, he himself made such a report. Based on his own reporting of his parents' alleged verbal abuse, such programs presumably would have been open to him. Secondly, in his Complaint, the only program which Syrjala identifies as *possibly* having been excluded from is the BPI program which is not a program affiliated with the Town. Finally, as pointed out by the Town, there is not a scintilla of evidence

that any Defendant took any action, or failed to take any action, against or for the benefit of Syrjala *on account of his alleged disability.* Indeed, the uncontested facts in the record establish that none of the Defendants was aware that Syrjala suffered from a disability.

To the extent that Syrjala is asserting that the Defendant police officers violated the ADA by failing to give him additional time to gather his belongings. Again, there is no evidence in the record which a would support a finding that any Defendant knew that Syrjala was disabled. Moreover, Syrjala, cannot establish that in executing the Chapter 258A Order, there was a procedure whereby the police could grant him additional time, or as previously held, that any officer prevented him from getting his medications or medical equipment. Accordingly, Syrjala cannot establish that his rights were violated under the ADA and therefore, the Defendants are entitled to summary judgment on this claim.

<u>Plaintiff's Equal Protection Claim</u>

The equal protection clause of the fourteenth amendment guarantees to every person within the United States the right to equal protection of the laws. It applies to the activities of police agencies and protects persons from irrational discrimination in either acts of commission or omission. *See Smith v. Ross*, 482 F.2d 33, 36–37 (6th Cir.1973). Police officers must fulfill this duty without intentionally discriminating against such persons on an irrational basis. *Id.* at 36–37 ("a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection" of the law). A § 1983 plaintiff must allege and establish that a police officer failed to fulfill an affirmative duty to enforce the laws equally and fairly. Put another way, if a police officer is under a duty to protect persons within the area of his authority, he must do so on a fair

and equal basis. The equal protection clause requires him to perform his duties without intentionally discriminating on an irrational basis. Police officials cannot refuse to protect a particular class of persons, when under the same or similar circumstances they would protect others, without a rational reason for doing so. *See generally Bartalone v. Berrien Cty.*, 643 F. Supp. 574, 577 (W.D. Mich. 1986). Based on the record before, me no rationale factfinder could conclude that any of the Defendant police officers intentionally failed to act to protect Syrjala's rights as a disabled person where they would have protected a non-disabled person. Indeed, there is no evidence in the record which would support a finding that Syrjala was treated any differently than any other person (disabled, disabled with more pronounced symptomology or non-disabled) who has a Chapter 258E Order served upon him. Accordingly, summary judgment shall enter for the Defendants on this claim.

<u>Qualified Immunity</u>

Defendants assert that they are entitled to qualified immunity on Plaintiff's federal and state civil rights claims. The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). Under the two-part test adopted by the First Circuit, the relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *See Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st Cir.2009). For purposes of the second prong, whether the right in question was "clearly established" depends on "(a) whether the legal contours of the right in question were sufficiently

clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Mlodzinski v. Lewis,* 648 F.3d 24, 32–33 (1st Cir.2011). "This prong of the inquiry, while requiring a legal determination, is highly fact specific, and may not be resolved on a motion for summary judgment when material facts are substantially in dispute." *Swain v. Spinney,* 117 F.3d 1, 9 (1st Cir.1997). I have previously found that as a matter of law, on the record before me, Syrjala cannot establish that any of the individual Defendants violated his clearly estblished constitutional rights. However, even if I were to assume that such a violation had been proved, they would have been entitled to qualified immunity. The individual Defendants and other Grafton police officers responded to the numerous 911 and other communications from both Syrjala or Richard addressing issues from the mundane to more serious allegations of abuse and harassment made by one against the other. When the arrived at the house, the issues between Syrjala and Richard had been resolved, and/or the it was unclear whether the allegations were valid. From all objective appearances, the Defendant police officers were constantly being drawn into an ongoing dispute between Syrjala and his elderly parents about his continuing to reside at their home. It was a very difficult and compicated situation for all parties and taking the facts in the light most favorable to Syrjala, under the circumstances, no reasonable police officers in their position would have known that their conduct violated his rights. Accordingly, were it necessary to address the issue, I would find that the individual Defendants are entitled to qualified immunity.

**<u>Conclusion</u>**

It is hereby Ordered that:

1. Defendants' motion for summary judgment (Docket No. 64) is ***<u>granted</u>***;

2. Defendants' motion to strike Plaintiff's affidavit (Docket No. 72), is ***<u>granted</u>***; and

3. Defendants' motion to strike Plaintiff's statement of 340 additional facts (Docket No.

73) is ***<u>granted</u>***.

Judgment shall enter for the Defendants.


<u>/**s**/ *Timothy S. Hillman*</u>
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**